**NORTH CITY AREA-WIDE COUNCIL, INC., et al.**

v.

**George W. ROMNEY, Secretary of Housing and Urban Development, et al.**

**Civ. A. No. 69-1909.**

United States District Court,
E. D. Pennsylvania.

July 9, 1971.

William S. Rawls, Matthew M. Strickler, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for plaintiffs.

Merna B. Marshall, Asst. U. S. Atty., Philadelphia, Pa., for federal defendants.

Matthew W. Bullock, Jr., First Asst. City Sol., Philadelphia, Pa., for municipal defendants and Goldie E. Watson, Model Cities Director.

## OPINION AND ORDER

JOHN MORGAN DAVIS, District Judge.

Plaintiff, North City Area Wide Council, Inc. (AWC), is a non-profit corporation with its principal place of business in Philadelphia, Pennsylvania. AWC's principal function was to represent the residents of the Model Cities target area during the planning of the Philadelphia Model Cities Program, and to provide citizen participation in the Program. The individual plaintiffs are residents of the target area[1] of the Philadelphia Model Cities Program. Plaintiffs bring this action on their own behalf and on behalf of all those similarly situated pursuant to Rule 23(b) (2) of the Federal Rules of Civil Procedure.

Defendants are George W. Romney, Secretary of Housing and Urban Development; the Department of Housing and Urban Development (HUD); James H. J. Tate, Mayor of the City of Philadelphia; the City of Philadelphia (the City); and Goldie E. Watson, Model Cities Administrator of the City of Philadelphia.

Plaintiffs have brought this action for mandatory and injunctive relief pursuant to 28 U.S.C.A. §§ 1331, 1361, and the Administrative Procedure Act which provides that "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C.A. § 704. The parties have agreed that this hearing shall be considered as a final hearing on the merits as well as hearing on the Preliminary Injunction.

Plaintiffs have presented this Court with issues pertaining to (1) the application of that section of the Demonstration Cities and Metropolitan Development Act of 1966, 42 U.S.C.A. § 3301 et seq. (Model Cities Act), which provides that to be eligible for Federal aid, a "comprehensive city demonstration program," must "provide * * * widespread citizen participation in the program" and the Secretary of Housing and Urban Development must "emphasize local initiative in the planning * * * [of it]." 42 U.S.C.A. §§ 3303(a) (2), 3303(b) (1); and (2) whether the AWC should be reinstated as the citizen participation unit of Philadelphia's Model Cities Program.

In accordance with the direction of the Third Circuit Court of Appeals, which remanded this case to us, North City Area Wide Council, Inc., et al. v. Romney, et al., 428 F.2d 754 (C.A. 3rd, 1970), a trial was held on the merits of plaintiffs' claim that the AWC should be reinstated and that certain actions taken by HUD, the City, and the Model Cities Administrator were illegal. For the reasons stated below, this Court finds that Philadelphia's Model Cities Program is being operated in accordance with the Model Cities Act, and this Court should not compel AWC's reinstatement as Philadelphia's citizen participation unit.

### Background

In 1966, Congress recognized the need for an extensive effort to aid urban residents in coping with the massive problems in America's cities and in improving the quality of urban life. In an attempt to meet this need, Congress passed the Model Cities Act. The purposes of the Model Cities program are "to provide additional financial and technical assistance to enable cities of all sizes * * * to plan, develop, and carry out locally prepared and scheduled comprehensive city demonstration programs containing new and imaginative proposals * * * to improve living conditions for the people who live in such areas * * *" 42 U.S.C.A. § 3301.

Local initiative and citizen participation are considered the keys to an effective program. This sentiment was expressed in a HUD statement of policy

---

[1]. The target area is "the area of the city covered by the [Model Cities] program." 42 U.S. C.A. § 3303(a) (1).

which said that " * * * improving the quality of life of the residents of a model neighborhood can be accomplished only by affirmative action of the people themselves. This requires a means of building self-esteem, competence and a desire to participate effectively in solving the social and physical problems of their community." City Demonstration Agency Letter No. 3 (Oct. 30, 1967) (Plaintiffs' Exhibit 5).

Under the terms of the Model Cities Act, the Secretary is authorized to make grants and provide technical assistance to enable city demonstration agencies [2] to plan, develop and carry out comprehensive city demonstration programs. 42 U.S.C.A. § 3302. One of the criteria for funding under the Model Cities Act is "widespread citizen participation in the program." 42 U.S.C.A. § 3303(a)(2). The Secretary must review each city demonstration program and he must find that each program meets the criteria of 42 U.S.C.A. § 3303 before funds will be allocated. 42 U.S.C.A. § 3305(a).

On March 3, 1967, the City of Philadelphia applied for a grant to plan and develop a Model Cities Program for Philadelphia. Shortly thereafter AWC was organized from a number of existing organizations and entered into a contract with the City to act as the local citizen participation unit for the Philadelphia Program.

After several re-executions and extensions of the contract, it terminated on June 30, 1969, when negotiations for a new contract reached an impasse. AWC ceased to function as the citizen participation unit and a new organization was established to take its place.

After negotiations on the new contract failed, AWC brought suit to compel its reinstatement, alleging that certain provisions in the proposed new contract were illegal. The Court of Appeals found that the provisions which the AWC found objectionable contained major policy changes in the Model Cities Program in that they contemplated a reduced involvement in the Program by the citizen participation unit, AWC. North City Area Wide Council v. Romney, *supra*, at 758. The Court of Appeals also found that the policy changes were made without the required citizen participation. North City Area Wide Council v. Romney, *supra*, at 758. The Court of Appeals found that the Secretary had violated the Model Cities Act by accepting the new policies without citizen consultation. The Court of Appeals, however, declined to consider whether or not all actions taken by the HUD and the City since the institution of the "new" policy have been illegal.

The decision of this Court rests upon the complex set of facts which were elicited at the trial, many of which were not before the Court of Appeals when it ruled on the issues. Those facts must be set forth here in order that the position of this Court and each party may be fully understood.

*Facts*

The initial contract between the City and AWC was signed August 21, 1967. Under the contract, the AWC was to be an organization which consisted of 16 "Hubs." Each Hub covered a geographic unit in the Model Cities target area. AWC was to have a board consisting of 92 members, and an executive committee. In the contract, the AWC agreed to conduct planning under the Model Cities Program and provide general administrative and operational supervision. AWC was to maintain proper fiscal records and report to the Model Cities Administrator on its work. The contract was also made subject to the terms of the Philadelphia Home Rule Charter.

---

**2.** " 'City demonstration agency' means the City, the county, or any local public agency established or designated by the local governing body of such city or county to administer the comprehensive city demonstration program." 42 U.S.C.A. § 3312(2).

In 1967 and 1968, the Model Cities Program was in the planning stage, and HUD, under its statutory mandate, issued a number of policy statements dealing with various aspects of the program. These are known as CDA Letters (City Demonstration Agency). The CDA letters indicate that the citizen participation units are to be used to plan, monitor and evaluate programs.[3] They are not to be program operators. (Healy, NT 634–635). Citizen participation as defined by HUD means that the citizen component of the Model Cities Program must have access to and an opportunity to influence the decision-making process ultimately entrusted to the local government.[4] "The City Demonstration Agency is not meant to be a multi-functional operating agency." [5]

On February 5, 1969, a Regional Inter-Agency Coordinating Committee meeting was held in Philadelphia to review with the City and AWC Philadelphia's 1968 submission for Model Cities funds. The meeting was attended by representatives of HUD and the Philadelphia CDA (the City and AWC). At that meeting, the conflict of interest issue was raised. By conflict of interest, HUD meant the problems which might arise if the same citizen participation unit which was planning and evaluating the Model Cities Program, namely AWC, was also to operate the program. Mr. William Meek, Executive Director of the AWC, attended the February 5th meeting and was aware of the HUD policy. (Meek NT 145–147; Healy NT 633).

On March 19, 1969, Mayor James H. J. Tate received a letter from Floyd H. Hyde, Assistant Secretary, Department of HUD. The letter was similar to those sent to mayors of all other Model Cities and was the clearest expression of HUD citizen participation policy to date. That letter stated:

"* * * HUD's policy is that local City Demonstration Agencies (and their Model Cities staff and citizen participation arms) are not intended to serve as program operators. CDA Letter Number 6 specifically states that 'The CDA is not meant to be a multi-functional operating agency.'

CDA's are expected to coordinate the activities of the various existing agencies whose new or existing functions impact on the model neighborhood. CDA's are expected to use their supplemental funds to influence and persuade these existing agencies to modify present practices, priorities and programs identified and goals established as a result of Model Cities planning.

Where there is no appropriate existing agency to carry out a new program which has been planned as part of the Model Cities effort, the City can certainly organize a new operating agency—such as a nonprofit corporation. The CDA or its citizen board should be a program operator only as the last resort and then only as a transition matter. If the CDA becomes a program operator, your Model Cities program could easily become just another local program competing for scarce resources and incapable of effectively performing the coordination, recourse allocation, and institutional change role for which it is intended." [6]

Mr. William Meek, Executive Director of AWC, knew of the March 19th letter, and testified that he discussed its contents with the Executive Board of AWC, although no position was taken on the document. (Meek NT 154–155).

On April 15, 1969, John Buggs, then Deputy Director of the Model Cities Administration in Washington, and Mr. Chester Jones, a staff member, met with

3. CDA Letter No. 3 (Oct. 30, 1967), (D–5).

4. Technical Assistance Bulletin No. 3 (Dec.1968), p. 16 (P–6).

5. CDA Letter No. 6 (Oct.1968), (D–24).

6. Letter to Mayor James H. J. J. Tate, from Floyd H. Hyde, Assistant secretary for Model Cities, re: Some Concerns Growing out of Early Experience of the Model Cities Program, March 19, 1969, p. 3 (D–2).

Defendant Watson, officials from the HUD Regional Office, Mr. Meek, and AWC staff. The meeting concerned fiscal and administrative policies, and the March 19, 1969 Hyde letter. On April 18, 1969, Mr. Buggs sent a Memorandum of Understanding to those with whom he had met on April 15, 1969. That memorandum stated that, "Mr. Meek agreed that AWC would not present a plan which involved that organization in extensive program operation." [7] Neither the AWC nor the Model Cities Administrator could operate projects.

On April 30, 1969, the City of Philadelphia submitted a revised Model Cities program to HUD for approval. The April 30 Submission was necessary to supplement the earlier December 31, 1968 Submission because Philadelphia Model Cities funds had been cut almost 50%. A new Submission was needed to conform to the lesser amount of funds. The April 30 Submission was sent to HUD after full participation by and consultation with the citizens of the target area, through AWC. The April 30 Supplementary Submission attempted to address itself to the major problems facing Model Cities residents. That document stated:

> "The program proposed here seeks to address the twin problems of poverty and powerlessness by (1) assisting Model Cities residents to assume some control over their own economic resources and providing effective mechanisms for participating in the policy-making systems of the city, and (2) providing programs and services which are developed by and therefore more capable of meeting the needs of the Model Cities residents." [8]

The April 30 Submission proposed the formation of seven nonprofit corporations to operate Philadelphia's Model Cities Projects. The AWC was to have a varying role in selecting the boards of directors of those corporations. The April 30 Submission also provided for programs to be conducted by the Model Cities Administrator, the Deputy Managing Director for Housing and the Department of Recreation of defendant City, the General and Specialty Contractor Association of Philadelphia, an Urban Venture Capital Corporation and the North City Congress.

After a review of Philadelphia's April 30 Submission, Floyd H. Hyde, Assistant Secretary of Housing and Urban Development, sent a letter to defendant Tate, raising specific objections to the Philadelphia application:

"1. Unusually heavy reliance on new corporations to carry out extraordinarily difficult assignments.

2. Heavy involvement, in these operating corporations, of the same citizen group which is the major neighborhood representative for Model Cities planning, monitoring, evaluating and resource allocation.

3. Insufficient involvement of the City of Philadelphia and of established institutions, businesses and voluntary agencies in most parts of the program." [9]

John W. McLean, Director of Operations for Model Cities, HUD in Washington, testified that the May 27 Hyde Letter was not a take it or leave it proposition. HUD expected alternative proposals from the City (McLean NT 688).

On June 2, 1969, defendant Watson met with Robert H. Baida, Deputy Assistant Secretary of Housing and Urban Development. The main topic of discussion was the May 27 Hyde letter. No representative of AWC was present at that meeting.

---

7. Memorandum: John A. Buggs, Deputy Director HUD to Mrs. Goldie Watson, et al., April 18, 1969 (D-3).

8. Supplement to the Application to HUD of April 30, 1969 (P-16).

9. Letter from Floyd H. Hyde to Mayor James H. J. Tate, May 27, 1969, p. 1 (P-4).

On June 3, 1969, defendant Watson met with Mr. Meek, Executive Director of AWC, Mr. Patton, President of AWC, and Mrs. Yvonne Perry, HUD Liaison Officer with the Model Cities Program. Mrs. Watson testified that at that meeting she gave all present a copy of the May 27 letter and stated that she would be willing to cooperate with AWC in responding to the letter. (Watson, NT 531, 535–537; Meek NT 83, 156; Patton, NT 491, 494). Mr. Patton expressed a willingness to cooperate in preparing a reply, however, Mr. Meek expressed an unwillingness to cooperate. Although Mrs. Watson knew that Mr. Meek represented an organization (AWC) and he needed its approval to make decisions, Mr. Meek was considered by Mrs. Watson as the spokesman for AWC and he had so acted in the past (Meek NT 143, 144, 163). At that meeting, the City told AWC it was willing to convene a meeting with Mr. Hyde's Deputy, Mr. Baida, on June 9, 1969, but AWC refused to participate in such a meeting. AWC, instead, adopted a strategy of by-passing the Model Cities Administrator and appealing to the City and HUD in an attempt to procure a reversal of the policies stated in the Hyde letter. AWC sent its own telegrams to the Mayor seeking to arrange a meeting, and to Mrs. Perry, HUD coordinator, asking her to arrange a meeting with Mr. Baida. The Mayor declined to meet with AWC at that time, and there is no indication of the reaction from Mrs. Perry.

Mrs. Watson explained to Messrs. Meek and Patton that a reply to the May 27 letter was expected within 10 days. Mrs. Watson told them she had Mr. Baida standing by for a meeting with AWC on June 9 and requested a list of AWC board members so she could send out invitations. Messrs. Meek and Patton refused to hand over the list on the grounds that it was AWC policy not to give the Model Cities Administrator a list of AWC board members. Mrs. Watson pressed her demand for the list saying that she did not want to meet with people she did not know (Watson NT 538). AWC finally reversed its "policy" against giving out a list of members, but the list was not transmitted to Mrs. Watson until June 23, 1969.

Mrs. Watson was now faced with an unusual situation. She had to draft a reply to the Hyde letter. The reply was a matter of some urgency. She wanted the cooperation of the citizen participation unit, but the citizen participation unit failed to participate. She had no other alternative but to draft the reply herself in order to satisfy HUD and to wait until a later date to negotiate between herself, AWC and HUD regarding the Hyde letter. Defendants Tate and Watson drafted the revised proposal and submitted it to HUD on June 9, 1969. The June 9 revision stated: "It must be emphasized that this statement has been prepared by the [Model Cities] Administrator [of defendant Philadelphia] without the participation, review or endorsement of the Area-Wide Council." [10] The June 9 revision substantially decreased the role AWC would play in nominating the boards of directors of the seven non profit corporations which were to operate the Model Cities Program. On July 3, 1969, Mr. Baida replied to the June 9, 1969 statement by accepting the changes in the Philadelphia Model Cities Program, but imposing an additional limitation on it:

"It should be understood that the initial board is to serve only for the first action year and that no person nominated for and serving on such a board, either in the first year or subsequent years of operation, can, at the same time, be a member of the citizen organization. In addition, although up to one-third of the initial nominations may be made by the citizen organization, subsequent selection of board members must be accomplished by

10. Supplementary Statement to Philadelphia application, June 9, 1969 from Mrs. Watson, p. 1 (P–7).

some other method than by nomination of the citizen organization." [11]

This letter was then accepted by the defendants Tate and Watson as establishing HUD policy for the conduct of the Philadelphia Model Cities Program. However, the letter was considered by HUD and the City to open the door to further consultation and was "part of a stream of correspondence between HUD and the City in an area in which refinements of policy were taking place * * *" (McLean NT 701). The letter, however, was consistent with prior HUD policy that citizen participation units were to be program planners and evaluators rather than program operators.

On June 30, 1969 (prior to the Baida letter of July 3rd) Federal approval was given to part of the Philadelphia plan contained in the Submission of April 30, 1969. All parties agreed that the April 30 plan was made with the participation and approval of AWC. Federal approval of that part of the program which is part of this dispute was held in abeyance pending the outcome of this litigation. No additional changes in the Philadelphia plan were made until after a new citizen participation unit was organized by the City pursuant to statute. (Will NT 479–482, 485).

After the termination of AWC's contract on June 30, 1969 and after contract negotiations ceased on July 10, 1969, Mrs. Watson took steps to organize a new citizen participation component. Three of the AWC Hubs expressed a desire to remain affiliated with the Model Cities Program. (Watson NT 562).

Therefore, Mrs. Watson retained the geographic units formally known as Hubs, and each geographic unit, now called a Neighborhood Council, elected individuals to serve on the citizens committee. A permanent group of 47 individuals was installed in October 1970 and that group is now functioning as Philadelphia's citizen participation unit. At least 15 of those 47 were formerly associated with AWC. (Watson NT 557, 558). Therefore, at the present moment, Philadelphia's Model Cities program is functioning with the "widespread citizen participation required by 42 U.S.C.A. § 3303."

In light of all the facts presented in this case, this Court finds that the Philadelphia Model Cities Program is now, and has been, operating in accordance with the statutory mandate. The Hyde letters of March 19, 1969 and May 27, 1969, merely reiterated a long standing HUD policy that the citizen participation units were to be program planners, not program operators. HUD was attempting to provide a system of checks and balances for the Model Cities Program. Any program evaluation made by the same group which was operating the program would be less effective than review by an independent organization. The citizen participation unit was to serve as that independent body. The conflict of interest and vested interests which would result from any other policy are clear. An organization which would both plan, review and operate programs would soon develop an interest in perpetuating itself. The effects of such a plan would ultimately have a negative impact on the citizens of the area which the Model Cities Program is attempting to serve.

The Supplemental Submission made by the City on June 9, 1969, was an attempt to incorporate HUD policies into the program. AWC was aware of HUD's policies, but it indicated an unwillingness to accept them. It must also be noted that AWC's contract with the City required that AWC assist in planning and evaluation, not in program operation. If the June 9 Supplement was made without consultation with AWC,

11. Letter, Mr. Robert Baida to Mrs. Goldie Watson, July 3, 1969 (P–8). The words "can, at the same time, be a member of the citizen participation organization" were later changed to say member of the citizen participation *board*. (McLean NT 699–701).

the reason was AWC's own unwillingness to cooperate and negotiate. Even assuming, arguendo, that actions taken by HUD and the City were illegal for want of citizen participation, it was AWC's own actions which forced the illegality to occur. AWC failed to interpret the policy concerning citizen participation in the sense that all other parties did. That the matters in dispute were still negotiable. (Meek NT 168–169; Cooper NT 309; Watson NT 595; Will NT 397). Further, Mr. Meek testified that he would rather have no Model Cities Program in Philadelphia than have AWC go along with the policy of citizen participation which excluded direct operations at the project. (Meek NT 168–169). Such a statement can only lead one to conclude that AWC had already acquired certain vested interests and AWC was more interested in the welfare of AWC than the welfare of the Model Cities Community.

With respect to the actions taken by HUD and the City, this Court finds that they were not a radical change in policy. HUD was not changing its policy with respect to citizen participation, but was taking steps to implement a long standing policy regarding program operation. HUD's policy was always open to negotiations and revision, and AWC could have negotiated with defendants if it desired to do so. Defendants Watson and Tate took a reasonable position in submitting the June 9, 1979 supplement to HUD when AWC expressed an unwillingness to cooperate. Mr. Robert Baida's July 3, 1969 revision of the Philadelphia proposal was an implementation of HUD policy and his revision was not an administrative fiat, but was intended to open up communication between the City, HUD and AWC.

Assuming, arguendo, that actions taken by HUD and the City were illegal between the dates of April 30 and July 3, any illegality has long since been corrected by the formation of a new citizen participation unit and by HUD's decision not to fund and implement that part of the program which is the subject of this dispute. Those projects which were funded were those which were part of the April 30, 1969 submission and were drawn up with full citizen participation.

### Termination of AWC's contract with City

On June 30, 1969, AWC ceased to be the citizen participation arm of the Philadelphia Model Cities Program. The Court of Appeals made the following statement with respect to the reasons why AWC refused to sign a new contract:

"Because of these changes which AWC considered unlawful, and because the City refused to negotiate with AWC concerning them, AWC refused to enter into a new contract to serve as the citizen representative for the Program beyond June 30, 1969." North City Area Wide Council v. Romney, *supra* at 757.

The Court of Appeals was operating under the assumption that AWC refused to sign a new contract for one reason, namely, refusal to accept "illegal" HUD policies. During the trial, certain facts were revealed which indicate that refusal to accept HUD policy was only part of the reason for AWC's refusal to sign a contract. The facts further show that the City had ample reason, aside from the policy disagreement, to terminate AWC's contract.

Contract negotiations between the City and AWC continued until July 10, 1969. On July 2, 1969, defendant Watson sent a memorandum to the AWC. That memorandum stated in part:

"7. The policies and provisions which are incorporated in the Supplementary Statement dated June 9 have been transmitted to the Federal Government by the Mayor and represent official policy of the city of Philadelphia. For this reason, I must insist that those policies and provisions be incorporated in any new agreement be-

tween the City and the Area-Wide Council." [12]

First, we have already stated that the policies stated in the June 9 letter were negotiable. In addition, the policies which were to be incorporated in the contract were not radically different from those which had been included in prior contracts between the City and AWC. AWC knew the contract was subject to revision. The proposed contract stated, "The terms and conditions of this contract will be subject to change as required by any amendment to the Act or federal guidelines which is effected subsequent to the execution of this contract." [13]

Two officers of the AWC Executive Board disagreed with the City policy, but recognized that the terms were negotiable. Mr. Clarence Patton, President of the AWC board of directors and Father Jordan, financial secretary and later treasurer of AWC, both testified that they favored signing the contract and negotiating from that position (Jordan NT 379–380; Patton NT 507).

Therefore, with respect to the policy provisions in the proposed contract, the AWC had two alternatives before it. It could sign the contract and work out the problems later, or it could refuse to sign the contract. AWC chose the later course of action (Meek NT 98–99; Cooper NT 309; Patton NT 507).

Second, there were reasons entirely divorced from the policy. considerations why contract negotiations reached a stalemate. AWC lodged objections to certain portions of the contract having to do with resumes, schedules of accomplishment, and fiscal responsibility.[14] The specific provisions objected to provided:

"I. NCAWC will provide CITY with the job titles, job descriptions, names and addresses of all staff members employed during the term of this contract. NCAWC will maintain in its files a resume for each staff member employed during the term of this contract. Upon the request of CITY, NCAWC will transmit to CITY the resume of any staff member at a salary level of over Seven Thousand Five Hundred Dollars ($7,500). The minimum content of such job description and resumes will be determined by CITY.

J. CITY will have the right to establish schedules of accomplishment for specific activities related to the planning and implementation of the program. Section 2, E. NCAWC will comply with the provisions of the 'Code of Fiscal and Administrative Practices' dated July 1, 1969 * * * "

AWC objected to paragraph J because it felt deadlines for program accomplishment were unworkable when dealing with a citizen participation organization (Meek NT 202). AWC objected specifically to the proposed fiscal policies because they wanted a partnership arrangement and they felt that partnership arrangement would be destroyed if the Model Cities Administrator had a contractual right to review all payment requisitions proposed by AWC prior to disbursement (Meek NT 203, 209–210).

Mrs. Watson, on the other hand, felt that the disputed provisions were necessary in light of past problems she had encountered with AWC. Mrs. Watson testified that the Model Cities Administrator is in charge of fiscal and personnel practices (Watson NT 516). On

12. A document: "To all Executive Board and Staff Members of the Area-Wide Council," from Goldie E. Watson, Subject: Basic Facts of Our Contract Situation, July 2, 1969, p. 3, ¶ 7 (P–22).

13. Proposed form of contract re: Model Cities Program, June 30, 1969 (not executed), Sec. 2 ¶ G.

14. Letter dated July 1, 1969 from William Meek to Goldie Watson in response to her telegram requesting a statement of those contract issues which were unacceptable to AWC.

April 18, 1969 she informed Mr. Meek that he was to have a fiscal policy. AWC was being funded at the rate of $51,000 per month and was spending $40,000 (Watson NT 522). She had ample reason to request a sound fiscal procedure.

She further stated that AWC had difficulty functioning efficiently. For example, a simple project which was to be completed within two or three weeks took eighteen months (Will NT 488).

Mr. William Will, Deputy Model Cities Administrator, testified that Mrs. Watson had further difficulty with AWC. AWC had not complied with provisions in prior contracts in that AWC failed to maintain adequate financial records, failed to adopt adequate personnel standards, failed until June 23, 1969, to furnish the Model Cities Administrator with a list of its board members, failed to submit to the City or HUD resumes of its employees, failed to supply copies of records of meetings and elections (except upon Court request), and failed to take various actions in time to meet federal and City deadlines. (Will NT 389–396).

Upon the above mentioned facts, the Court finds that (1) Philadelphia's Model Cities Program is and has been operating in accordance with the Model Cities Act, (2) AWC was always afforded access to program planning, and the Model Cities Administrator did all she could to obtain AWC's cooperation in program planning, (3) the termination of the contract between AWC and the City was the result of AWC's own actions, (4) the City had grounds to terminate AWC's contract for reasons wholly separate from the policy disputes because AWC had not lived up to its part of the contract, and (5) the Neighborhood Councils which were formed after AWC's contract terminated are presently functioning as Philadelphia's citizen participation unit in accordance with statute.

Therefore, this Court finds in favor of all defendants and declares that it will not use its power to reinstate AWC as Philadelphia's citizen participation unit, nor will it enjoin defendants from operating the Philadelphia Model Cities Program in the manner in which it is presently being operated.