NORTH CITY AREA–WIDE COUNCIL, INC., Appellant, et al.

v.

George W. ROMNEY, Secretary of Housing and Urban Development, Department of Housing and Urban Development, et al.

No. 71–1772.

United States Court of Appeals, Third Circuit.

Argued Nov. 19, 1971.

Reargued Dec. 15, 1971.

Decided Feb. 25, 1972.

Certiorari Denied May 30, 1972.

See 92 S.Ct. 2063.

**812**

William S. Rawls, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for appellant.

Merna B. Marshall, Asst. U. S. Atty., Philadelphia, Pa., for Federal appellees.

S. Jay Sklar, Asst. City Sol., Philadelphia, Pa., for City appellees.

Argued Nov. 19, 1971.

Before BIGGS, ADAMS and MAX ROSENN, Circuit Judges.

Reargued Dec. 15, 1971.

Before BIGGS, MAX ROSENN and HUNTER, Circuit Judges.

## OPINION OF THE COURT

BIGGS, Circuit Judge.

The determination of this case depends, as we stated previously in 428 F. 2d 754, 755 (1970), on the meaning of the requirements in the Demonstration Cities and Metropolitan Development Act of 1966[1] (the "Act"). The complaint in this case, filed August 15, 1969, has as plaintiffs North City Area-Wide Council, Inc., and various persons living within the so-called "target area" of the Philadelphia Model Cities Program, referred to collectively as "AWC," and is brought on their own behalf and on behalf of all other persons similarly situated pursuant to Rule 23(b) (2), Fed.R.Civ.Proc., 28 U.S.C. The defendants are George W. Romney, Secretary of Housing and Urban Development, the Department of Housing and Urban Development (HUD), Mayor James H. J. Tate, of Philadelphia,[2] Goldie E. Watson, Model Cities Administrator for Philadelphia, and the City of Philadelphia (City or Philadelphia). Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1361. The complaint describes the Model Cities Program to be made operational pursuant to the Act which authorized the Secretary of Housing and Urban Development to make grants to local governments to plan and implement comprehensive Model Cities Demonstration Programs.

The gravamen of the complaint is that the defendants proceeded to implement the Model Cities Program in Philadelphia without regard for AWC and the provisions of the Act. The plaintiffs sought, *inter alia*, temporary and permanent injunctions to prevent the defendants from proceeding with the implementation of the Philadelphia Model Cities Program. The case came on for hearing before the District Court on a stipulation of facts, the defendants moving for summary judgment. The motion was granted[3] and an appeal was taken to this court. We reversed, *sub nom.* North City Area-Wide Council, Inc. v. Romney, 428 F.2d 754 (1970), and remanded the case for further proceedings in accordance with our opinion. The District Court proceeded to final hear-

---

1. 80 Stat. 1255, 42 U.S.C. § 3301 et seq.

2. Now succeeded by Mayor Frank L. Rizzo.

3. No opinion was reported for publication.

ing on an extensive record and ordered the complaint dismissed. See, North City Area-Wide Council, Inc. v. Romney, 329 F.Supp. 1124 (1971). The appeal at bar followed.

■ In our previous opinion we defined the requirements of the Act. We said that "to be eligible for Federal aid, a 'comprehensive city demonstration program,' must 'provide . . . widespread citizen participation in the program' and the Secretary of Housing and Urban Development must 'emphasize local initiative in the planning . . . [of it].' " [4]

We also stated: "These requirements form a central and novel feature of the Demonstration Cities Act, in whose prologue the Congress declared: '. . . that improving the quality of urban life is the most critical domestic problem facing the United States. The persistence of widespread urban slums and blight, the concentration of persons of low income in older urban areas, and the unmet needs for additional housing and community facilities and services arising from rapid expansion of our urban population have resulted in a marked deterioration in the quality of the environment and lives of large numbers of our people while the nation as a whole prospers. . . .' 42 U.S.C.A. § 3301.

"The purpose of the Act stated by Congress was 'to provide additional financial and technical assistance to enable cities of all sizes . . . to plan, develop and carry out locally prepared and scheduled comprehensive city demonstration programs. . . .' 42 U.S. C.A. § 3301. The basic philosophy of the Act was well-expressed by the Department of Housing and Urban Development ('HUD') in a statement of its policy concerning citizen participation: '. . . improving the quality of life of the residents of a model neighborhood can be accomplished only by the affirmative action of the people themselves. This requires a means of building self-esteem, competence and a desire to participate effectively in solving the social and physical problems of their community.' " See CDA Letter No. 3 set out in the margin.[5] Perhaps the best expres-

---

4. 42 U.S.C. §§ 3303(a) (2) and 3303(b) (1).

5. This quotation is from HUD's City Demonstration Agency (CDA) Letter No. 3, of October 30, 1967, which provided:
SUBJECT: Citizen Participation.
   1. *INTRODUCTION*
   Section 103(a) (2) of the Demonstration Cities and Metropolitan Development Act of 1966 (42 U.S.C. Section 3303(a) (2)] requires that a Model Cities program provide for widespread citizen participation in the program."
   2. *POLICY STATEMENT ON CITIZEN PARTICIPATION*
   The implementation of this statutory provision requires: (1) the constructive involvement of citizens in the model neighborhood area and the city as a whole in planning and carrying out the program, and (2) the means of introducing the views of area residents in policy making should be developed and opportunities should be afforded area residents to participate actively in planning and carrying out the demonstration.
   This requirement grows out of the conviction that improving the quality of life of the residents of the model neighbor-

hood can be accomplished only by the affirmative action of the people themselves. This requires a means of building self-esteem, competence and a desire to participate effectively in solving the social and physical problems of their community.
   HUD will not determine the ideal organizational pattern designed to accomplish this objective. It will, however, outline performance standards for citizen participation which must be achieved by each City Demonstration Agency. It is expected that patterns will vary from city to city, reflecting local circumstances. The city government, as the principal instrument for carrying out the Model Cities program, will be responsible for insuring that whatever organization is adopted provides the means for the model neighborhood's citizens to participate and be fully involved in policy-making, planning and the execution of all program elements. For a plan to be approved, it must provide for such an organization and spell out precisely how the participation and involvement of the residents is to be carried out throughout the life of the Model Cities program.

sion of Congress' intent in passing the Act was employed by plaintiffs' counsel in oral argument in this court: *viz.,* "Power to the powerless," that is to say, it was the intention of Congress to cause the poverty-stricken citizens of our larger cities to improve their lot by their own efforts.

Many, in fact most, of the operative facts in this case are not disputed. Those set out in the opinion of the District Judge, 329 F.Supp. at 1126–1131, and stated in our former opinion, 428 F.2d at 756–758, as well as those in the present extensive record, are not at substantial variance though the interpretations to be put on them and views as to applicable law differ. Those essential to our decision follow.

Pursuant to the Act, on March 3, 1967 Philadelphia applied to the Secretary for a grant to enable the planning of a Model Cities Program. Soon thereafter AWC was organized in the so-called "Target area." [6] The AWC consisted of approximately 458 associated persons from approximately 145 organizations within the target area. This was intended to provide the local "citizen participation" in the Philadelphia program. Shortly thereafter a contract was entered into to provide the required citizen participation.

On November 16, 1967 the City received a grant of $203,000 from the Secretary for the planning and development of its Model Cities Program and after extensive planning for a period in excess of a year, by consultation between the City and AWC, the City on December 31, 1968 submitted to the Secretary an application for a grant to implement a Model Cities Program for Philadelphia.

On February 5, 1969, a Regional Inter-Agency Coordinating Committee meeting was held in Philadelphia to review with the City and AWC Philadelphia's proposed 1968 submission for Model Cities funds. This meeting was attended by HUD representatives, by members of the Philadelphia City Demonstration Agency (CDA), and AWC.

3. *PERFORMANCE STANDARDS FOR CITIZEN PARTICIPATION IN MODEL NEIGHBORHOOD PROGRAMS*
In order to provide the citizen participation called for in the Act, there must be some form of organizational structure, existing or newly established, which embodies neighborhood residents in the process of policy and program planning and program implementation and operation. The leadership of that structure must consist of persons whom neighborhood residents accept as representing their interests.
The neighborhood citizen participation structure must have clear and direct access to the decision making process of the City Demonstration Agency so that neighborhood views can influence policy, planning and program decisions. That structure must have sufficient information about any matter to be decided for a sufficient period of time so that it can initiate proposals and react knowledgeably to proposals from others. In order to initiate and react intelligently in program matters, the structure must have the technical capacity for making knowledgeable decisions. This will mean that some form of professional technical assistance, in a manner agreed to by neighborhood residents shall be provided.
Where financial problems are a barrier to effective participation, financial assistance (e. g., baby sitting fees, reimbursement for transportation, compensation for serving on Boards or Committees) should be extended to neighborhood residents to assure their opportunity to participate.
Neighborhood residents will be employed in planning acitvities and in the execution of the program, with a view toward development of new career lines, including appropriate training and modification of local civil service regulations for entry and promotion.
See also Technical Assistance Bulletin No. 3 (December 1968).

6. The "Target area" was defined in note 4 of our previous opinion as follows: "Target area" is the term popularly used to describe what the Act refers to as "the area of the city covered by the [Model Cities] program." 42 U.S.C. § 3303(a) (1). The same description is given in note 1 of the opinion of the District Court in 329 F.Supp. at 1125.

At this meeting, apparently for the first time, an issue of conflict of interest was raised by HUD. In this connection the District Judge stated in his opinion: "By conflict of interest, HUD meant the problems which might arise if the same citizen participation unit which was planning and evaluating the Model Cities Program, namely AWC, was also to operate the program. Mr. William Meek, Executive Director of the AWC, attended the February 5th meeting and was aware of the HUD policy." [7] The accuracy of these statements cannot be doubted. The issue of conflict of interests has become the guiding star of the arguments of AWC's opponents. A conflict was undoubtedly present and was a contributing factor to the actions of the defendants complained of by AWC and set out hereinafter. It must be borne in mind that the City was required to approve all plans.[8]

On March 19, 1969 Mayor Tate received a letter from Assistant Secretary Floyd H. Hyde of HUD. A similar letter was sent to the Mayors of other cities engaged in the Model Cities Program and was an expression of participation policy as of that date. The letter as quoted in our previous opinion stated: " '. . . HUD's policy is that local City Demonstration Agencies (and their Model Cities staff and citizen participation arms) are not intended to serve as program operators. CDA Letter Number 6 specifically states that "The CDA is not meant to be a multifunctional operating agency." CDA's are expected to coordinate the activities of the various existing agencies whose new or existing functions impact on the model neighborhood. CDA's are expected to use their supplemental funds to influence and persuade these existing agencies to modify present practices, priorities and programs identified and goals established as a result of Model Cities planning.

" 'Where there is no appropriate existing agency to carry out a new program which has been planned as part of the Model Cities effort, the City can certainly organize a new operating agency— such as a nonprofit corporation. The CDA or its citizen board should be a program operator only as the last resort and then only as a transition matter. If the CDA becomes a program operator, your Model Cities program could easily become just another local program competing for scarce resources and incapable of effectively performing the coordination, recourse [sic, resource] allocation, and institutional change role for which it is intended.' " This letter was discussed by Mr. William Meek, Executive Director of AWC, with AWC's Executive Board but no position was taken by the Board insofar as the record indicates.

On April 15, 1969, Mr. John Buggs, then Deputy Director of the Model Cities Administration, and Mr. Chester Jones, a staff member of HUD, had a meeting with Mrs. Watson, officials from the HUD Regional Office, Mr. Meek and the AWC staff. There was a discussion of fiscal and administrative policies and of the Hyde letter of March 19. On April 18, 1969, Mr. Buggs sent a "Memorandum of Understanding" to the persons he had met on April 15, 1969, stating that "Mr. Meek agreed that AWC would not present a plan which involved that organization in extensive program operation."

On April 30, 1969 the City's application to HUD was supplemented after further consultation between HUD, the City, and AWC. The April 30, 1969 supplement clearly demonstrated the powerlessness of the citizens to influence decisions affecting their community as the factor most responsible for perpetuating the undesirable conditions existing in the target area. A large part of this Program was to be administered by seven non-profit corporations. A majority of the directors of four of the corporations and large minorities of the di-

---

7. See 329 F.Supp. at 1127.

8. 42 U.S.C. § 3304(b) (1).

rectors of the other three corporations were to be chosen by AWC.

On May 27, 1969, by a letter addressed to Mayor Tate, Assistant Secretary Hyde objected to the Philadelphia Model Cities Program because of the heavy involvement of the AWC in the non-profit corporations and because of the insufficient involvement in the Program on the part of the City of Philadelphia. On June 2, 1969, Deputy Assistant Secretary of HUD, Robert H. Baida, came to Philadelphia to meet Mrs. Goldie Watson, Philadelphia Model Cities Administrator, to discuss the problems outlined in Assistant Secretary Hyde's letter of May 27. AWC attaches much significance to the fact that no AWC representative attended this meeting, asserting that this was because Deputy Assistant Secretary Baida did not want any representative of AWC to be present and for this reason requested a meeting only with Mrs. Watson and her staff. It is clear that this assertion is not completely borne out by the record. It does appear that HUD asked for a meeting with Mrs. Watson and that she did not invite any member or representative of AWC to be present at her meeting with Mr. Baida. At that meeting, a "new policy" was discussed. The "new policy" is that set out in the March 19 letter of Secretary Hyde to Mayor Tate quoted above but we think it cannot be successfully maintained that that policy was made crystal clear. It seems, however, to have been directed toward excluding AWC from exercising a direct operational function as we think was required by CDA Letter No. 3. AWC's role was to be reduced to an advisory capacity. At her meeting with Mr. Baida, Mrs. Watson protested the new policy but apparently finally acceded to it.[9] Mr. Baida insisted that a proper plan would have to be submitted to HUD within ten days. No adequate

reason for this very short time limit appears from the record.

On the following day, June 3, Mrs. Watson had a meeting with President Patton of AWC and Mr. Meek, and explained to them that a reply was expected to the Hyde letter of May 27th within ten days. Mrs. Watson testified that at that meeting she gave to all persons present a copy of the May 27th letter and stated that she would be willing to cooperate with AWC in responding to the letter. President Patton expressed a willingness to cooperate in preparing a reply but Mr. Meek at that time refused cooperation.[10] Thereafter, with the express authorization of AWC's Executive Committee, on June 6, Mr. Meek sent identical telegrams to Mayor Tate and Mrs. Watson,[11] as follows: "URGENTLY REQUEST REPLY TO SECT. HYDE'S LETTER BE POSTPONED UNTIL AUDIENCE WITH YOU BE HELD BY AREA-WIDE COUNCIL BOARD REPRESENTATIVES. REQUEST THIS MEETING ON MONDAY JUNE 9TH IF POSSIBLE. SINCERELY, WILLIAM R. MEEK, AREA EXECUTIVE DIRECTOR, AREA-WIDE COUNCIL." It was earnestly contended by counsel for the Federal defendants at the argument before us that the wire had been sent to Mayor Tate only and not to Mrs. Watson. Counsel's contention was erroneous. This substantially is the end of the story insofar as AWC is concerned for Mrs. Watson seems to have assumed the position that no cooperation was possible with AWC and dispatched her reply to the May 27th letter on June 9. The District Judge states by way of explanation for Mrs. Watson's action that: "[She] explained to Messrs. Meek and Patton that a reply to the May 27 letter was expected within 10 days. Mrs. Watson told them she had Mr. Baida standing by for a meeting with AWC on June 9 and requested a list of AWC board mem-

9. We do not intend to imply any weakness of character on the part of Mrs. Watson. Indeed, it seemed to have been a situation where who pays the piper calls the tune.

10. 329 F.Supp. at 1129.

11. Exhibit P–20.

bers so she could send out invitations. Messrs. Meek and Patton refused to hand over the list on the grounds that it was AWC policy not to give the Model Cities Administrator a list of AWC board members. Mrs. Watson pressed her demand for the list saying that she did not want to meet with people she did not know. . . . AWC finally reversed its 'policy' against giving out a list of members, but the list was not transmitted to Mrs. Watson until June 23, 1969." [12] She further stated in her communication of June 9 to HUD with respect to the revised proposal: *"It must be emphasized that this statement has been prepared by the [Model Cities] Administrator [of defendant Philadelphia] without the participation, review or endorsement of the Area-Wide Council."* (Emphasis in original).

The opinion of the District Court states at the meeting of June 3, 1969, "[T]he City told AWC it was willing to convene a meeting with Mr. Hyde's Deputy, Mr. Baida, on June 9, 1969, but AWC refused to participate in such a meeting. AWC, instead, adopted a strategy of by-passing the Model Cities Administrator and appealing to the City and HUD in an attempt to procure a reversal of the policies stated in the Hyde letter. AWC sent its own telegrams to the Mayor seeking to arrange a meeting, and to Mrs. Perry, HUD coordinator, asking her to arrange a meeting with Mr. Baida. [Mayor Tate] declined to meet with AWC at that time, and there is no indication of the reaction from Mrs. Perry." [13] We conclude that this finding is not supported by the evidence. There is no showing that the telegram

sent by AWC to Mrs. Watson was not sent in good faith.

AWC's contract with the City was allowed to expire on June 30, 1969 and after further contract negotiations ceased, on July 10, 1969, Mrs. Watson took steps to organize a new citizen participation committee, three of the seven AWC Hubs expressing a desire to remain affiliated with the Model Cities Program. The new committee consisted of 47 persons, at least 15 of whom were formerly associated with AWC. In connection with this the District Court made the following conclusion, stating: " . . . [A]t the present moment, Philadelphia's Model Cities program is functioning with the 'wide-spread citizen participation required by 42 U.S.C.A. § 3303.'" The court went on to say: "In light of all the facts presented in this case, this Court finds that the Philadelphia Model Cities Program is now, and has been, operating in accordance with the statutory mandate." [14, 15]

The Federal defendants insist that the supplemental submission by the City of June 9, 1969 did not constitute a major change in the program and "In fact, it did not create any change at all." [16] We cannot agree.

The issue which we have before us is clearly stated by the plaintiffs as follows: "The central issue in this case is whether the changes made in the Philadelphia Model Cities Program by means of the letter of Assistant Secretary Hyde of May 27, 1969, Mrs. Watson's supplementary statement of June 9, 1969, and the July 3, 1969 letter of Deputy Assistant Secretary Baida were made with the citizen participation re-

12. 329 F.Supp. at 1129.

13. In respect to both quotations, see *id.* at 1129.

14. *Id.* at 1130.

15. The District Court stated, *id.* at 1131: " . . . Mr. Meek testified that he would rather have no Model Cities Program in Philadelphia than have AWC go along with the policy of citizen participation which excluded direct operations at the project. . . . Such a

statement can only lead one to conclude that AWC had already acquired certain vested interests and AWC was more interested in the welfare of AWC than the welfare of the Model Cities Community." This statement seems to imply that Mr. Meek and AWC had an interest adverse to the Philadelphia Model Cities Program. We find nothing in the record which supports the view expressed by the District Court.

16. Federal Appellees' Brief at 33–34.

quired by the Model Cities Act and the regulations thereunder. In its decision in this matter, on the basis of the April 30, 1969 supplement to the Philadelphia application and the three documents by which the changes were made this Court concluded [North City Area-Wide Council v. Romney, *supra*, 428 F.2d 758]: '. . . [T]he issue is not citizen veto or even approval, but citizen participation, negotiation, and consultation in the major decisions which are made for a particular Model Cities Program. While not every decision regarding a Program may require full citizen participation, certainly decisions which change the basic strategy of the Program do require such participation. The June 9th decision of the City and the July 3rd statement of HUD made such fundamental changes in the Philadelphia Program. Previously, that Program had contemplated a much heavier involvement by the designated citizen participation component, AWC. This involvement was drastically reduced by the unilateral actions of the City and HUD. The Secretary therefore violated the Act when he accepted a proposal for major modification of the Model Cities Program from the City which made clear on its face there had been no citizen participation in its formulation. . . .' " [17]

■■ The very essence of the Act is participation by the inhabitants of the affected community, and AWC's position was correctly stated by Mrs. Watson when she said and we repeat, "It must be emphasized that this statement [*i. e.*, the supplementary proposal of June 9, 1969] has been prepared by the [Model Cities] Administrator [of Philadelphia] without the participation, review or endorsement of the Area-Wide Council." Manifestly the various programs have continued for a considerable length of time under the auspices of the Interim Committee which eventually ceased to be "interim" and became a committee created from the target area. A misunderstanding of the law by the District Court has not inhibited the HUD programs. Nonetheless, we find ourselves unwilling to accept what we deem to be error to prevent or to avoid the operation of the Act as intended by Congress. Perhaps a workable solution to the difficulties presented by the attitudes of the respective parties can be arrived at. It is possible and we hope probable that the passage of time may have sweetened the minds of the parties to this suit and their representatives.

We must reverse the judgment and we will direct the District Court upon remand to enter an order providing:

1. That plaintiff, Area-Wide Council, be reinstated forthwith insofar as it may be the citizen participation organization for the Philadelphia Model Cities Program.

2. That Area-Wide Council as such citizen representation organization negotiate in good faith with the existing citizen structure for the purpose of integrating that structure into the organization of the Area-Wide Council.

3. That the City of Philadelphia negotiate with the Area-Wide Council in good faith for the purpose of entering into an agreement with it for the Council to act as the citizen representation organization for the Philadelphia Model Cities Program, the form of contract dated June 30, 1969 (Exhibit P–11) to serve as a basis for these negotiations, it being understood, however, that in accepting any contract, Area-Wide Council will not be bound by the illegal changes made in the Philadelphia Model Cities Program by the Hyde letter of May 27, 1969, the Watson memorandum of June 9, 1969, or the Baida letter of July 3, 1969.

4. That HUD and the City negotiate in good faith with the Area-Wide Council concerning all changes made in the Philadelphia Model Cities Program since May 27, 1969.

A judgment will be entered in accordance with the foregoing.

17. Appellants' Brief at 17.